# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| DEVIN GRAINGER, on behalf of himself and others similarly situated,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>PRECISION OF NEW HAMPTON, INC.,<br><br>　　　　Defendant. | No. C22-2043-LTS-KEM<br><br>**MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION TO CERTIFY CLASS** |

## I.　INTRODUCTION

This case is before me on plaintiff Devin Grainger's motion (Doc. 12) for class certification. Defendant Precision of New Hampton Inc. (Precision) has filed a resistance (Doc. 18) and Grainger has filed a reply (Doc. 23). Oral argument is not necessary. *See* Local Rule 7(c).

## II.　BACKGROUND

Grainger was previously employed at Precision and seeks to certify a class of similarly-situated current and former employees to recover unpaid wages in the form of a bonus. Precision is a family-owned business that manufactures a variety of torque converters.[1] It employs approximately 150 hourly-wage employees at its New Hampton facility. Employees are eligible to receive mid-year and year-end bonuses.

---

[1] A torque converter is a vehicle component essential to the operation of an automatic transmission, performing a role similar to a manual transmission's clutch by reducing power transfer from the vehicle's engine to its transmission, such as when a car is idling at a stop. Doc. 18 at 4.

The parties dispute whether bonuses were guaranteed or discretionary and whether employees knew that bonuses were not guaranteed. Grainger asserts that the bonuses were guaranteed based on job advertisements and paystubs, in which an "effective hourly rate" included bonuses. He also relies on the employee handbook, noting that the most recent version (Version 4), issued in approximately 2021, states that semi-annual bonuses are not guaranteed and subject to the employer's discretion, but earlier versions were silent with respect to the payment of bonuses.

Precision notes Version 1 was in effect during the relevant time period, late 2019 into 2020, and argues that Version 4 is irrelevant to Grainger's claims. Version 1 states employees will be paid "an hourly rate, are eligible for overtime, and may receive a varying amount of compensation for each pay period, based on the number of hours worked and overtime provisions." Doc. 18-1 at 22. Grainger signed an acknowledgment as to this version. *Id.* at 43. Version 1 also states that employees who resign or are terminated "forfeit the right to any and all commissions, bonuses, benefits or other privileges to which he/she may have become eligible at a date subsequent to termination of employment." *Id.* at 12. Precision notes that no version of the employee handbook states that employees will receive an "effective hourly rate" at any future date and notes that no money is allocated for bonuses at the time weekly paychecks are issued. According to Precision, bonus determinations are made with input from supervisors and are at the discretion of the owner, Dennis Hansen, and his son, Tyler Hansen, depending on the company's performance and whether there are funds available.

Plant Manager Randy Heying and Foreman Rich Bast assist Dennis and Tyler with bonus determinations by reporting information regarding employee performance. This includes assessment of the quality of work, tardiness, disciplinary write-ups and other criteria. According to Precision, Heying and Bast routinely informed employees that bonuses were not guaranteed (including throughout 2019 and 2020). Heying would also inform potential employees during job interviews that bonuses are not guaranteed. Both Heying and Bast would also inform employees when handing out bonus checks that there

was no guarantee that Precision would disburse bonuses every six months. Based on their discussions, employees would express their understanding that bonuses were discretionary and never guaranteed.

Precision's hourly employees are paid either through direct deposit or a paper paycheck and pay stub. Employees are paid weekly. Employees who receive payment via direct deposit receive an email with an electronic pay stub attached. Prior to June 3, 2020, the email stated: "[t]he hourly rate listed on this paystub ([rate]) does not factor in your bonuses or the additional 6 percent 401(k) compensation we pay you. Your effective hourly rate after factoring these in is [effective rate]." *Id.* at 2. The paystub also identified the hourly rate being paid at that time, the number of hours worked in the pay period and the gross pay paid to the employee at that time. *Id.* at 3. Those receiving paper paychecks and paystubs had a sticker manually placed on the pay stub that identified either an "effective rate," "pay rate w/401(k) & bonus," "wage rate w/bonus/401(k)," "Rate +401k/bonus" or similar words. Grainger asserts that each employee's effective hourly rate or "sticker rate" was in excess of the hourly rate (and the hourly rate plus the 6 percent 401(k) contribution) and that no employee received payment for the effective rate or sticker rate at that time.[2]

Precision's position is that the effective hourly rate or sticker rate on an employee's pay stub is a retrospective calculation of their past week's earnings, their past two bonus payments and Precision's six percent 401(k) contribution. It explains that the bonus component is computed by adding the employee's previous two bonuses, if any, divided by 2080 hours. Precision states it has never determined future bonuses in reliance on the effective hourly rate listed. On or about November 20, 2019, Precision paid a bonus to hourly employees. From November 20, 2019, through May 27, 2020, employees received a communication from Precision identifying their effective pay rate including their bonuses.

---

[2] Grainger makes no allegation of failure to pay the 401(k) contributions.

3

In April 2020, the United States Department of Labor Wage and Hour Division investigated Precision and determined that Precision's lunch policy – reducing lunches to 20 minutes in order to shorten employees' workdays – violated the Fair Labor Standards Act (FLSA). Precision paid $279,505 in back wages for the 20-minute breaks.

Beginning in June 2020, paychecks no longer referenced an "effective rate" or any rate other than the hourly rate on the pay stub. For the mid-year 2020 bonus, Hansen went through a list of hourly employees and decided whether to pay a bonus and if so, how much. Grainger asserts most employees, including himself, did not receive a summer 2020 bonus. As a result, Grainger asserts that for hours worked from November 21, 2019, through May 23, 2020, employees were not paid the effective rate multiplied by hours worked, except for the few who received a summer 2020 bonus.

Precision seeks to put this time period into context, noting that it was during the onset of the COVID-19 pandemic. It states that its industry slowed substantially and Precision's own production numbers were down. As such, it reduced employee hours and its production volume plunged. Moreover, there was a lot of uncertainty regarding how Precision would come back from this downturn. The financial data for April 2020 (the last full month's data before bonuses were determined in May 2020) showed revenue down 20 percent that month as compared to 2019 and net sales were down 24 percent. Given the financial situation, Precision notes that threshold criteria for bonuses (whether funds were available) was hampered based on the business outlook. Precision notes that 73 employees still received mid-year 2020 bonuses.

Grainger was paid the following bonuses from Precision:

4

| | |
|---|---|
| 6/10/2016 | $60 |
| 11/20/2016 | $250 |
| 6/10/2017 | $726 |
| 11/20/2017 | $2,358 |
| 6/26/2018 | $1,925 |
| 11/21/2018 | $3,425 |
| 6/10/2019 | $1,750 |
| 11/20/2019 | $3,050 |

Doc. 19 at 5. Precision points out that Grainger had no written communications with Precision with respect to a mid-year or year-end bonus and had no discussions with Dennis or Tyler. In a deposition, Grainger recalled that he would be given constructive criticism about performance when given a bonus check. The only wage Grainger claims he is entitled to in this lawsuit is a mid-year 2020 bonus. He resigned in August 2020.

Grainger asserts the following claims:

- Count 1 – Violation of § 91A of the Iowa Wage Payment Collection Law (IWPCL)
- Count 2 – Violation of § 91A.3 of the IWPCL
- Count 3 – Breach of Contract
- Count 4 – Negligent Misrepresentation
- Count 5 – Retaliation in Violation of the FLSA
- Count 6 – Wrongful withholding of Bonus Wages in Violation of Public Policy

Doc. 2. He requests certification of a class defined as "all current and former hourly employees of Precision working within the State of Iowa from November 21, 2019, through May 23, 2020." Doc. 12-1 at 19.

### III. DISCUSSION

*A. Applicable Law*

Federal Rule of Civil Procedure 23 governs class certification. Under Rule 23(a), the party seeking certification must demonstrate:

(1) the class is so numerous that joinder of all members is impracticable;

5

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

The proposed class must also satisfy at least one of the three requirements under Rule 23(b). Here, plaintiff seeks certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any question affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted).

Courts are instructed to "conduct a 'rigorous analysis' to determine whether the prerequisites for a class action under Rule 23(a) are satisfied." *Rattray v. Woodbury Cnty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010) (quoting *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The "rigorous analysis" may "entail some overlap with the merits" in evaluating whether plaintiffs have met the Rule 23(a) requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). However, in determining whether to certify a class action, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). "Rule 23 does

6

not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

B.   *Rule 23(a) Requirements*

  1.   *Numerosity*

Grainger argues that with the possible exception of a handful of new employees, all 150 hourly employees would have been eligible for a mid-year 2020 bonus, meeting the numerosity requirement. Grainger also argues that I should consider the possible fear of retaliation when considering this factor, as individuals may be reluctant to bring their own actions based on a fear of retaliation from their employer.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Relevant factors include: the number of persons in the proposed class; the size of the individual claims; the inconvenience of trying individual suits; and any other factor relevant to the practicability of joining all of the putative class members. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 669-60 (8th Cir. 1982). According to Dennis Hansen's declaration, 73 employees received a mid-year 2020 bonus, which would essentially cut Grainger's proposed class in half. Doc. 19 at 4-5. The Eighth Circuit has upheld class certification with as few as 20 individuals. *See Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971). Assuming that the remainder of employees or the majority of them claim entitlement to the mid-year 2020 bonus based on Grainger's theory of recovery, I agree with Grainger that joinder would be impracticable and it would be inconvenient to try individual suits for employees who maintained the same claim based on the same argument. Grainger has satisfied the numerosity requirement.

### 2. *Commonality*

Grainger argues the proposed class meets the commonality requirement because class members share common questions of law and fact on the legality of Precision's uniform wage/bonus practices, including questions such as:

- Whether the "effective hourly rate" communicated to employees on a weekly basis along with pay stubs documenting time worked constitutes "wages" within the definition of Iowa Code § 91A.2
- Whether Precision has intentionally and willfully failed to pay wages within the meaning of § 91A.8
- Whether Precision has failed to pay wages within twelve days, excluding Sundays and legal holidays, after the end of the period in which the wages were earned as required by § 91A.3
- Whether an agreement to pay wages in the form of a bonus as a type of deferred compensation existed between Precision and its employees
- Whether Precision negligently misrepresented wages to employees
- Whether Precision has liability for withholding wages in reaction to a wage complaint being made against it to the United States Department of Labor

Doc. 12-1 at 10-11. Grainger admits these are primarily legal issues and that legal issues are inherently common across a class. With regard to factual issues, Grainger notes Precision has no uniform policy in its employee handbook reserving the right not to pay a bonus. He also notes Precision advertised that it paid two annual bonuses in job postings and its effective rate or sticker rate on employee pay stubs was always higher than the wages actually paid and was used to retain employees.

Precision primarily challenges class certification on the issue of commonality, arguing that the proposed plaintiffs have not satisfied the same injury requirement. It

8

argues that Grainger has adduced no evidence that the effective hourly rate was ever based on subsequent bonuses. Precision asserts the effective rate was not sufficiently definite so as to transform any policy regarding bonuses into a contract and that Grainger's testimony suggests the opposite. He testified he did not know how Precision calculated the effective rate and Precision never discussed it with him. He also testified that bonuses were performance-based and that bonuses fluctuated up and down for employees, including himself. With regard to Grainger's reliance on job advertisements, Precision disputes that these ever formed a contract generating an expectancy. Additionally, existing employees likely did not see the advertisements and, in any event, all employees were repeatedly told that bonuses were not guaranteed. Overall, Precision argues that Grainger's contentions present individualized questions dependent on whether each employee reviewed advertisements and misunderstood paystubs.

"Commonality requires a showing that class members 'have suffered the same injury.'" *Powers v. Credit Mgmt. Servs.*, 776 F.3d 567, 571 (8th Cir. 2015) (quoting *Falcon*, 457 U.S. at 157). This requirement is satisfied when the legal question "linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (quoting *Paxton*, 688 F.2d at 561). "Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor." *Dukes*, 564 U.S. at 350. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The commonality requirement cannot be satisfied by demonstrating that class members have all suffered a violation of the same provision of law." *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011). "Plaintiffs cannot 'simply leap from the premise that they were the victims of discrimination to the position that others must also have been.'" *Gonzalez v. Brady*, 136 F.R.D. 329, 331 (D.D.C. 1991) (quoting *Morrison v. Booth*, 763 F.2d

9

1366, 1371 (11th Cir. 1985)). "Dissimilarities within the proposed class . . . impede the generation of common answers." *Dukes*, 564 U.S. at 350.

Grainger claims Precision failed to pay a mid-year bonus in 2020 to which he and other employees were entitled by virtue of the "effective hourly rate" reflected on employee pay stubs and the two annual bonuses mentioned in job postings. Grainger's claim to the mid-year 2020 bonus is based primarily on breach of contract. Both parties cite Iowa law regarding unilateral contracts as the applicable standard. Under that standard, an employer's policy can be considered a unilateral contract when: (1) the policy is sufficiently definite in its terms to create an offer; (2) the policy is communicated to and accepted by the employee so as to constitute acceptance; and (3) the employee provides consideration. *See Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 283 (Iowa 1995). Courts "look for the existence of an offer objectively – not subjectively." *Id.* at 285. The test is whether an offer "induces a reasonable belief in the recipient that [the recipient] can, by accepting, bind the sender." *Id.* at 286 (quoting *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995)). "The standard is what a normally constituted person would have understood [the words] to mean, when used in their actual setting." *Id.* (quoting *New York Trust Co. v. Island Oil & Transport Corp.*, 34 F.2d 655, 656 (2d Cir. 1929)).

Precision argues that a court can deny class certification on a breach of contract claim based on individualized issues regarding the defense. *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010). In *Avritt*, plaintiffs claimed express breach of contract based on their interpretation of a contract's terms. The Eighth Circuit explained:

> Assuming that the Avritts' interpretation of the contract is plausible, however, the existence of two or more reasonable interpretations opens the door for extrinsic evidence about what each party intended when it entered the contract. In addition to extrinsic evidence about Northern's intent, Reliastar would be entitled to introduce evidence about how the contract was explained in various sales discussions and whether each purchaser's understanding of the contract was consistent with the theory the Avritts now

10

advance. Thus, Reliastar's liability to the entire class for breach of contract cannot be established with common evidence.

*Avritt*, 615 F.3d at 1030 (internal citations omitted). The common evidence Grainger seeks to use is that Precision posted an "effective hourly rate" or sticker rate on employee pay stubs in the six months leading up to mid-year 2020 and advertised semi-annual bonuses in job postings, each constituting an offer such that a unilateral contract was formed. Precision's defense is that the job postings did not form a contract and the paystubs did not make an offer because they were not sufficiently definite. *See* Doc. 18 at 19-20. As such, Precision argues it would be entitled to present evidence of its supervisors' communications to employees that bonuses were discretionary and evidence that some employees knew and acknowledged this, which would present individualized issues.[3]

The parties have identified both common and individualized issues. Because "[p]redominance subsumes the commonality requirement, I will analyze this factor "through the lens of predominance" below. *Custom Hair Designs by Sandy v. Central Payment Co., LLC*, 984 F.3d 595, 601 (8th Cir. 2020).

### 3. Typicality

Grainger argues that his claims and those of the putative class members are identical. He states they all received weekly explanations of their pay communicating an effective hourly rate that would be paid in the form of a bonus.

Precision argues that Grainger has an atypical position because some employees may have received a larger bonus in mid-year 2020 than they had in previous

---

[3] While Grainger does not recall a supervisor ever telling him a bonus was not guaranteed, *see* Doc. 18-1 at 91, another employee acknowledged in a text message exchange with Grainger that "bt [sic] then [sic] told us that bonuses werent [sic] guaranteed." *Id.* at 53. Heying and Bast also stated in declarations that they routinely informed employees that bonuses were not guaranteed. *Id.* at 104, 108.

years. It also argues that he misinterprets how the effective hourly rate is calculated. It notes that the majority of employees who continued working for Precision in 2020 received an end-of-year bonus and Precision has continued to pay bonuses. It notes that current employees do not hold the same interests of maximizing a mid-year 2020 bonus payment, as this would unduly benefit former employees through the work of current employees.

Typicality requires that the claims of the representative parties be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). As such, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156. "The typicality and adequacy criteria serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 821 (8th Cir. 2015) (citation omitted). Grainger's claim concerns only the mid-summer 2020 bonus, yet he includes all current and former hourly employees who worked for Precision from November 21, 2019, to May 23, 2020, in his proposed class. This would include the 73 employees who received a mid-year 2020 bonus. It is unclear if those members have suffered the same injury that Grainger is claiming – not being paid a mid-year bonus in the amount reflected in the "effective hourly rate" in the employee's the pay stub.

Grainger's claim is also based solely on the "effective hourly rate" reflected on his pay stub. He does not allege that he took the job based on an advertisement that mentioned the two annual bonuses and it is unclear how many, if any, employees can make that claim. Finally, Grainger claims that Precision never communicated to him that the bonus was discretionary, whereas Precision has demonstrated that at least one employee understood that to be the case. It has also presented evidence that supervisors communicated the discretionary nature of the bonus to other employees. I find that Grainger has not met his burden to establish typicality, as there appear to be different

injuries at issue as well as different applicable defenses among the putative class. As such, I find this requirement has not been met.

### *4. Adequacy of Representation*

Grainger argues he is an adequate representative because he shares the same interests with the putative class members and his counsel is well-qualified and experienced in this type of litigation. Precision disagrees that Grainger is an adequate representative, particularly with regard to those employees who continued working and were eligible for a year-end 2020 bonus. Because Grainger resigned in August 2020, he was not eligible for such a bonus. It also argues that Grainger's unique understanding of the effective hourly rate is different than those of other employees who were routinely informed that bonuses were not guaranteed.

Under Rule 23(a)(4), the class representatives and class counsel must fairly and adequately protect the interests of the class. "In deciding this question, the Court considers (a) whether the class representatives and their counsel will competently and vigorously pursue the action, and (b) whether differences exist between the interest of the class representatives and the putative class." *Morgan v. United Parcel Serv.*, 169 F.R.D. 349, 354 (E.D. Mo. 1996). With regard to the first inquiry, plaintiffs satisfy this element where they "share the same interests as those of the putative class[, which] shared interest insures the vigorous prosecution of the action by the named plaintiffs." *Jenson I*, 139 F.R.D. at 665 (citing *Bishop v. Committee on Professional Ethics, Inc.*, 686 F.2d 1278, 1289 (8th Cir. 1982)).

I do not find that Grainger's status as a former employee is sufficient to demonstrate a conflict. *See Sarviss v. General Dynamics Information Tech., Inc.*, 663 F. Supp.2d 883, 911 (C.D. Cal. 2009) ("Plaintiff seeks to represent both past and current employees, while he himself is a past employee. The court nevertheless sees no conflict of interest in Plaintiff's representation of all such employees, as . . . the relief Plaintiff seeks for such claims – damages – will be common to all such individuals."). Nor do I

13

find that he is subject to a unique defense because he was ineligible for a year-end 2020 bonus. However, because Grainger has not demonstrated that his claim is typical and for the reasons related to predominance discussed below, I find he cannot adequately represent the class. *See Gen. Tel. Co. of Sw.*, 457 U.S. at 157 n. 13 (explaining that the commonality, typicality and adequacy-of-representation requirements tend to merge).

## C.     Rule 23(b) Requirements

Grainger relies on Rule 23(b)(3), which requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Powers*, 776 F.3d at 569. The following factors are pertinent to these findings:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### 1.     Predominance and Commonality

Grainger argues common questions predominate because Precision failed to pay wages in the form of a bonus after communicating the effective hourly rate for six months. He asserts that Precision's policy not to pay the mid-year 2020 bonus was

14

applied uniformly. He cites cases in which courts have certified classes based on employee claims of unpaid bonus wages. Grainger asserts that individual employees' subjective beliefs about whether they were entitled to the bonus does not matter because I should determine the class based on what Precision communicated to employees and whether those employees continued working. Additionally, even if some proposed class members received a partial mid-year 2020 bonus, all class members suffered some loss and individual damages can be easily calculated.

Precision asserts that individual issues predominate based on either party's interpretation of the issue. It contends that even if Grainger could establish that he had a reasonable expectation as to a mid-year 2020 bonus, Precision would be entitled to introduce evidence regarding other employees' understanding of the bonus structure. As such, it argues that Precision's liability as to the entire class cannot be established with common evidence. Precision contends that individualized questions of how much employee's discretionary bonus should have been goes to liability and not merely damages because plaintiffs would have to prove each employee's bonus expectation for mid-year 2020 in order to prove liability.

As noted above, the predominance analysis subsumes commonality. *Custom Hair Designs by Sandy*, 984 F.3d at 601. "The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Elkins*, 219 F.R.D. at 419 (quoting *Bacon v. Honda of America Mfg., Inc.*, 205 F.R.D. 466, 486 (S.D. Ohio 2001)). It is not satisfied if "individual questions . . . overwhelm the questions common to the class." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478-79 (8th Cir. 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Ebert*, 823 F.3d

15

at 479 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). With regard to predominance, the Eighth Circuit has stated:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class. While limited in scope, this analysis should also be rigorous.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 618 (internal citations and quotation marks omitted). "In conducting this preliminary inquiry, however, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs['] general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades*, 400 F.3d at 566. The predominance requirement is "far more demanding" that Rule 23(a)'s commonality requirement. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). "In contrast to Rule 23(a)(2), the issue of predominance under Rule 23(b)(3) is qualitative rather than quantitative." *Ebert*, 823 F.3d at 478.

Precision compares the situation to that in *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 374 (8th Cir. 2013), in which pizza delivery drivers sought to form a class based on a delivery charge collected by Dominos that customers may have reasonably construed as a gratuity. The court concluded varying circumstances prevented class certification because some customers asked about the charge while others did not and some employees volunteered that it was a gratuity while others did not. *Luiken*, 705 F.3d at 374. The court stated those circumstances determined the objective reasonableness of construing the charge as a payment for personal services under the applicable statute. *Id.* Here, Precision argues that if the effective hourly rate on pay stubs creates a question as to whether an offer was extended, then extrinsic evidence concerning other communications to each employee prior to and during periods when the effective hourly

16

rate was listed on paystubs is highly relevant as to how reasonable employees interpreted that language.

*Luiken* involved the interpretation of a statute and a rule as to whether obligatory charges might reasonably be construed by a customer as payment for personal services rendered by an employee. *Id.* at 372-73. *Luiken* relied on *Avritt*, reasoning that context was critical in applying an objective, reasonable person standard. *Id.* at 373. In *Avritt*, there was no dispute that a contract existed. The dispute centered on the meaning of ambiguous contract terms, allowing the parties to submit extrinsic evidence of the parties' intent under Washington law. *Avritt*, 615 F.3d at 1030. Here, the issue appears to be whether there was an offer and whether its terms were sufficiently definite. Like *Luiken* and *Avritt*, this involves an objective inquiry and depends on the context of the offer or the setting in which it was made. *See Anderson*, 540 N.W.2d at 286 (noting the test is whether an offer "induces a reasonable belief in the recipient that [the recipient] can, by accepting, bind the sender" and that [t]he standard is what a normally constituted person would have understood [the words] to mean, when used in their actual setting.") (internal citations omitted).

Precision has demonstrated that the "setting" or context of the purported offer looks different for different employees (depending on whether they knew the bonuses were discretionary based on communications from supervisors or otherwise). While Grainger claims he was never told bonuses were discretionary, Precision has presented evidence of at least one employee who acknowledged as much, as well as declarations from supervisors stating they routinely communicated this to employees. *See* Doc. 18-1 at 53, 91, 104, 108. As such, individualized issues extend beyond damages, but affect liability as well based on Precision's defenses. *See Darms v. McCulloch Oil Corp.*, 720 F.2d 490, 493 (8th Cir. 1983) (affirming denial of class certification based in part because "the defenses raised in the case would necessarily vary based on the circumstances of each purchase"). While the basis for the purported offer is subject to common evidence based on the inclusion of an effective hourly rate or sticker rate on

17

employee pay stubs and job postings, the analysis must also take into account the context of that "offer" to a reasonable person in plaintiffs' position. For some plaintiffs, that will include knowledge that bonuses were discretionary. These individualized issues would predominate over common ones because Precision would be entitled to present the relevant setting or context in which the purported offer was made as to each employee, which cannot be done through evidence common to the class. As such, Grainger's claims are not appropriate for class resolution.[4]

### 2. Superiority

Grainger argues that class treatment is superior to individual claims because these issues affect potentially over 100 individuals, who will individually have relatively small damages. As such, individuals may lack incentive to bring an action themselves or fear retaliation.

Precision argues that class treatment is not superior because liability will depend on too many varied circumstances including what information, if any, was communicated to potential class members regarding the nature of the bonus. For instance, Precision maintains that its supervisors consistently informed employees that the bonuses were discretionary. The relevant inquiry is whether a reasonable employee would have understood the "effective hourly rate" to be an offer for a bonus, but that inquiry must also involve other relevant circumstances that would inform that decision. Those circumstances are not uniform for every employee.

Superiority tests whether class resolution would be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615. "In deciding whether class certification will achieve substantial efficiencies, the

---

[4] This applies to all of Grainger's claims, as they are all premised on the argument that class members were entitled to the mid-year 2020 bonus based on the "effective hourly rate" on pay stubs and advertisement of semi-annual bonuses in job postings, which rely on the theory that these amounted to an offer that the employee could accept through continued work at Precision.

proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members." *United States v. City of New York*, 276 F.R.D. 22, 49 (E.D.N.Y. 2011).

I agree with Precision that class treatment appears to offer no benefit compared to individual actions. While Precision may have uniformly communicated an "effective hourly rate" on all employee pay stubs, there are other relevant circumstances, including supervisors' communications, as to whether a reasonable employee would have considered the "effective hourly rate" to be an offer to pay a mid-year 2020 bonus. As such, class resolution is not the superior method for resolving this dispute.

IV. CONCLUSION

For the reasons stated herein, plaintiff's motion (Doc. 12) for class certification is **denied**.

**IT IS SO ORDERED.**

**DATED** this 6th day of February, 2023.

_____
Leonard T. Strand, Chief Judge